UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **BERKSHIRE LIFE INSURANCE COMPANY OF AMERICA** | ) ) ) | CASE NO.1:13CV2266 |
| **Plaintiff and Counterclaim Defendant** | ) ) ) ) | JUDGE CHRISTOPHER A. BOYKO |
| Vs. | ) ) | |
| **JOHN D. DORSKY, M.D.** | ) ) | OPINION AND ORDER |
| **Defendant and Counterclaimant** | ) ) | |

**CHRISTOPHER A. BOYKO, J:**

**I. ISSUE**

This matter is before the Court on Plaintiff and Counterclaim Defendant Berkshire Life Insurance Company of America's ("Berkshire Life") Motion for Summary Judgment (ECF DKT 38). For the following reasons, Berkshire Life's Motion is granted in part and denied in part. The Motion is granted as to the Breach of the Covenant of Good Faith and Fair Dealing counterclaim. The Motion is denied as to Berkshire Life's claims for Rescission of Policy No. Z2228950 in accordance with Ohio Revised Code ("O. R. C.") § 3923.14 and

Declaratory Judgment declaring the policy null and void, as well as the Breach of Contract counterclaim.

Also before the Court is Defendant and Counter-Claimant Dr. John D. Dorsky's ("Dorsky") Motion for Summary Judgment. (ECF DKT 46). Dorsky's Motion is denied on all claims.

## II. FACTS

Berkshire Life issued a disability income insurance policy, Policy No. Z2228950 (the "Policy"), to Dorsky in Ohio with a Policy Date of October 15, 2011 and an Expiration Date of October 15, 2022. (Compl. ¶ 6). The Policy included a Monthly Indemnity of $1,000, several riders and an annual premium of $3,730.89 to be paid quarterly. (Compl. ¶ 6; ECF DKT 1, 4). The Policy was issued pursuant to an Individual Disability Income Insurance Application (the "Application"). (Compl. ¶ 6). In the Application, signed by Dorsky on September 28, 2011, Dorsky answered "yes" to Question 6(b):

> Have you been continuously at work full time (at least 30 hours per week) performing the duties of your occupation for the past 90 days without limitation due to injury or sickness? (Disregard vacation days, normal non-working days, and any absences that total less than seven days.) (ECF DKT 1, 39; Compl. ¶ 11).

Berkshire Life alleges that the answer Dorsky provided to Question 6(b) was false. (Compl. ¶ 12). Berkshire Life also alleges that Question 6(b) is an important question because Berkshire Life's guidelines require that an underwriter review any response to Question 6(b) other than "yes" when determining whether to approve an application. (Pl.'s Memo. in Supp. of Pl. Mot. Summ. J. 3). Berkshire Life alleges that it issued the Policy in

2

response to Dorsky's "yes" answer to Question 6(b).  (Pl.'s Memo. in Supp. of Pl. Mot. Summ. J. 3).

Dorsky was the Chief of the Division of General Surgery at Cleveland Clinic from 2004 to approximately July 2012.  (Pl.'s Memo. in Supp. of Pl. Mot. Summ. J. 3).  As Chief of General Surgery, Dorsky performed the duties of a general surgeon, including evaluating patients who potentially had surgical problems and performing surgeries such as gall bladder removals, hernia repairs, gastric surgery and breast surgery.  (Pl.'s Memo. in Supp. of Pl. Mot. Summ. J. 3-4; Def.'s Mot. Summ. J. 3).  Dorsky also performed numerous administrative duties such as evaluating surgeons, investigating staff complaints, evaluating equipment for use in the operating room, acting as site director for the hospital's residency program, drafting the on-call schedule for the emergency room and overseeing Morbidity and Mortality Reviews ("M&M Review").  (Def.'s Mot. Summ. J. 3-4).  Dorsky did not list these administrative duties on the statement for disability benefits to Berkshire Life.  (Pl.'s Memo. in Supp. of Pl. Mot. Summ. J. 3).

In the 90 days prior to signing the Application, Dorsky performed less surgeries than in prior months due to pain in his shoulder.  (Pl.'s Memo. in Supp. of Pl. Mot. Summ. J. 4).  Specifically, Dorsky testified that during the month of August 2011 he made a "self-imposed decision" to complete less elective cases in order to give his shoulder time to recover.  (Pl.'s Memo. in Supp. of Pl. Mot. Summ. J. 7; Def..'s Mot. Summ. J. 4).  Throughout the months of August and September 2011, Dorsky saw many physicians and alternative health professionals regarding his shoulder, including: orthopedic surgeon Dr. Peter Evans; primary care physician Dr. Baljit Bal; anesthesiologist and pain management specialist Dr. Teresa

3

Dews; licensed acupuncturist Edward Dea RA; neurosurgeon Dr. Teresa Ruch and spine surgeon Dr. Thomas Mroz.  (Pl.'s Memo. in Supp. of Pl. Mot. Summ. J. 4-6).

Dorsky discussed his intense shoulder pain with these health professionals and how it affected his work.  Dorsky testified that he was trying "to limit heavy activities that put a strain on his arm" and testified that he told Dr. Evans on August 8, 2011, he "was going to try and back off from his workload."  (Pl.'s Memo. in Supp. of Pl. Mot. Summ. J. 4).  Dorsky informed Dr. Bal that it was difficult to perform his job because it "caused pain."  (Pl.'s Memo. in Supp. of Pl. Mot. Summ. J. 5).  Dorsky visited Dr. Dews on three occasions during August and September 2011 to receive steroid injections in his shoulder for pain.  (Pl.'s Memo. in Supp. of Pl. Mot. Summ. J. 6).  On those three occasions, Dorsky received sedation and on two of the occasions he could not return to work.  (Pl.'s Memo. in Supp. of Pl. Mot. Summ. J. 6).  Dorsky reported to Dr. Dea that he was not working a full schedule and that work was difficult due to his shoulder pain.  (Pl.'s Memo. in Supp. of Pl. Mot. Summ. J. 6). On September 12, 2011, Dorsky told Dr. Ruch that he had recently received a C5 nerve block to relieve the pain, but prior to receiving the block he was unable to work.  (Pl.'s Memo. in Supp. of Pl. Mot. Summ. J. 7).  Finally, Dorsky testified that he told Dr. Mroz that the pain was exacerbated by his work, particularly on long operating days.  (Pl.'s Memo. in Supp. of Pl. Mot. Summ. J. 7).  Of these physicians, only Dr. Ruch testified that she knew whether Dorsky had been working full time without limitation due to injury or sickness, and she testified that he was working full time without limitation due to his shoulder pain.  (Def.'s Mot. Summ. J. 10).

Although Dorsky sought pain management for his shoulder during August and September 2011, he testified that "unquestionably, yes, [he] could have performed any surgery [he] needed to perform in August of 2011." (Def.'s Mot. Summ. J. 4). Dorsky remained "on-call" for his scheduled days in August 2011. (Def.'s Mot. Summ. J. 5). On these "on-call" days he would handle all patient encounters for the day. (Def.'s Mot. Summ. J. 5). During August 2011, Dorsky also performed multiple M&M Reviews, which consisted of reviewing records of surgeries performed by peers that involve complications, after receiving pressure from hospital administrators. (Def.'s Mot. Summ. J. 5). During September 2011, Dorsky chose to perform elective surgeries even though he felt shoulder pain and never declined to perform a surgery due to pain. (Def.'s Mot. Summ. J. 8).

On August 16, 2011, Dorsky signed a Cleveland Clinic form entitled "Application for Absences" at the request of Cleveland Clinic main campus. (Pl.'s Memo. in Supp. of Pl. Mot. Summ. J. 8; Def.'s Mot. Summ. J. 7). The main campus directed Dorsky's office manager, Laura Ardire, to code August 8 - August 31, 2011 as medical leave. (Pl.'s Memo. in Supp. of Pl. Mot. Summ. J. 8; Def.'s Mot. Summ. J. 6-7). This time period coded as medical leave is when Dorsky was limiting his elective surgeries, focusing on administrative tasks and also taking nine days vacation. (Pl.'s Memo. in Supp. of Pl. Mot. Summ. J. 8; Def.'s Mot. Summ. J. 6-7). Ms. Ardire and Dorsky did not understand or agree with the decision to code the time as medical leave because it included "a period of time [he] had already worked" and Ms. Ardire testified that Dorsky was able to perform clinical work during the period. (Def.'s Mot. Summ. J. 7-8).

Berkshire Life offers a disability income insurance policy to Cleveland Clinic physicians and staff who earn in excess of $400,000.  (Def.'s Mot. Summ. J. 10).  Dorsky learned about the program through David Dickenson ("Dickenson"), an insurance agent with Berkshire Life, whom Dorsky had purchased other insurance products through in the past.  (Def.'s Mot. Summ. J. 10).  Dorsky informed Dickenson of his ongoing medical issues and work schedule and in response Dickenson told Dorsky to apply for the Policy.  (Def.'s Mot. Summ. J. 10-12).  Dickenson completed the Application on Dorsky's behalf and Dorsky signed the Application on September 28, 2011.  (Def.'s Mot. Summ. J. 12)  Dorsky did not review the Application prior to signing it.  (Def.'s Mot. Summ. J. 12).  Berkshire Life issued the Policy based on the Application on October 15, 2011.  (Def.'s Mot. Summ. J. 12).

On July 24, 2012, Dorsky submitted a claim for disability benefits.  (Pl.'s Memo. in Supp. of Pl. Mot. Summ. J. 9; Def.'s Mot. Summ. J. 12).  The Policy includes an incontestability period in which the Policy "will be incontestable as to the statements, except fraudulent statements, contained in the application after it has been in force for a period of two years during [the applicant's] lifetime, excluding any period during which [the applicant is] disabled."  (ECF DKT 1, 19).  In a letter dated October 11, 2013, Berkshire Life denied Dorsky's claim for benefits and rescinded the Policy, based on Dorsky's alleged material false statement in response to Question 6(b).  (Pl.'s Memo. in Supp. of Pl. Mot. Summ. J.9; Def.'s Mot. Summ. J. 12).  October 11, 2013, was two days short of the two-year incontestability period of the Policy.  (Def. Opp. Pl. Mot. Summ. J. 13)

On or about October 11, 2013, Berkshire Life commenced an action against Dorsky in the United States District Court Northern District of Ohio.  Berkshire Life's Complaint

6

alleges two Counts against Dorsky: **(I)** Rescission of Policy No. Z2228950 and **(II)** Declaratory Judgment - Policy No. Z2228950.  On or about January 23, 2014, Dorsky filed a Counterclaim alleging two Counts against Berkshire Life: **(I)** Breach of Contract and **(II)** Breach of Covenant of Good Faith and Fair Dealing.  Berkshire Life filed a Motion for Summary Judgment on Counts I and II of the Complaint and Counts I and II of the Counterclaim.  Dorsky filed a Motion for Summary Judgment on Counts I and II of the Complaint and Counts I and II of the Counterclaim.  These Motions are considered here.

### III. LAW AND ANALYSIS

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(a).  The burden is on the moving party to conclusively show no genuine issue of material fact exists, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994); and the court must view the facts and all inferences in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Once the movant presents evidence to meet its burden, the nonmoving party may not rest on its pleadings, but must come forward with some significant probative evidence to support its claim.  *Celotex*, 477 U.S. at 324; *Lansing Diary*, 39 F.3d at 1347.  The Court does not have the responsibility to search the record *sua sponte* for genuine issues of material fact.  *Betkerur v. Aultman Hosp. Ass'n.*, 78 F.3d 1079, 1087 (6th Cir. 1996); *Guarino v. Brookfield Township Trs.*, 980 F.2d 399, 404-06 (6th Cir.

1992). The burden falls on the nonmoving party to "designate specific facts or evidence in dispute," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986); and if the nonmoving party fails to make the necessary showing on an element upon which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323. Whether summary judgment is appropriate depends upon "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Amway Distribs. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003), quoting *Anderson*, 477 U.S. at 251-52.

### B. Summary Judgment is Denied to Berkshire Life and Dorsky on the Rescission Claim of the Complaint.

*1. The Policy Language is Ambiguous.*

Insurance policies issued in Ohio are governed by Ohio law. *Celina Mut. Ins. Co. v. Sadler*, 217 N.E.2d 255 (Ohio Ct. App. 1966). The Policy was issued in Ohio; thus it is governed by Ohio law. Under Ohio law "the determination whether a contract is ambiguous is made as a matter of law by the court." *Potti v. Duramed Pharm., Inc.*, 938 F.2d 641, 647 (6th Cir. 1991); *Broad St. Energy Co. v. Endeavor Ohio, LLC*, 975 F. Supp.2d 878, 883 (S.D. Ohio 2013). "Ambiguity exists only where a term cannot be determined from the four corners of the agreement or where contract language is susceptible to two or more reasonable interpretations." *Potti*, 938 F.2d at 647; *see Schachner v. Blue Cross & Blue Shield of Ohio*, 77 F.3d 889, 893 (6th Cir. 1996). However, "the mere possibility of multiple readings of a term does not necessarily warrant a finding of ambiguity." *Skinner v. Guarantee Trust Life Ins. Co.*, 813 F. Supp. 2d 865, 868-69 (S.D. Ohio 2011) (quoting *Nationwide Life Ins. Co. v.*

*Canton*, No. 09AP–939, 2010 WL 3405745, at *5 (Ohio App. Aug. 31, 2010)); *see State v. Porterfield*, 829 N.E.2d 690 (2005).

>Question 6(b) on the Application, to which Dorsky responded "yes," asked:
>
>Have you been continuously at work full time (at least 30 hours per week) performing the duties of your occupation for the past 90 days without limitation due to injury or sickness? (Disregard vacation days, normal non-working days, and any absences that total less than seven days.) (ECF DKT 1, 39).

Question 6(b) is subject to two reasonable interpretations and thus, is ambiguous. Berkshire Life interprets the term "duties" in Question 6(b) to mean "primary duties" and stresses that "Dorsky's *primary job duties* included not only evaluating patients with surgical problems, but performing surgery on patients who needed general surgery."  (Pl.'s Memo. in Supp. of Pl. Mot. Summ. J.12, emphasis added).  In contrast, Dorsky interprets the term "duties" to include all duties as the Chief of the Division of General Surgery, not strictly performing surgery.  (Def.'s Opp. to Pl.'s Mot. Summ. J. 6).  Thus, the term "duties" as used in the Application is subject to two reasonable meanings and Question 6(b) is ambiguous.

Further, the term "duties" is not defined in the Policy.  A term is ambiguous if it cannot be determined from the four corners of the agreement.  *Potti*, 938 F.2d at 647; *see Schachner*, 77 F.3d at 893.  Because the term "duties" is not defined within the policy, it cannot be determined from the four corners of the agreement.  Consequently, the term is ambiguous.

>*2. The Ambiguous Policy Language Must be Interpreted Against Berkshire Life and in Favor of Dorsky.*

The Sixth Circuit has held that "[i]f a court determines that a contract provision is ambiguous, then it may use traditional methods of contract interpretation to resolve the

9

ambiguity . . . ." *Schachner*, 77 F.3d 889, 893.  Ambiguities in insurance policies are "ordinarily interpreted against the insurer and in favor of the insured."  *Westfield Ins. Co*, 797 N.E.2d 1256, 1262 (Ohio 2003) ("[W]here the written contract is standardized and between parties of unequal bargaining power, an ambiguity in the writing will be interpreted strictly against the drafter and in favor of the nondrafting party"); *King v. Nationwide Ins. Co.*, 519 N.E.2d 1380, 1383 (Ohio 1988) ("[I]t is well-settled that, where provisions of a contract of insurance are reasonably susceptible of more than one interpretation, they will be construed strictly against the insurer and liberally in favor of the insured.").

Because the language in Question 6(b) is ambiguous it must be interpreted against the insurer, Berkshire Life, and in favor of the insured, Dorsky.  Thus, the term "duties" must be interpreted to include all duties as the Chief of the Division of General Surgery, not strictly performing surgery.

> *3. Summary Judgment is Denied to Both Parties Because Whether Dorsky's Answer to Question 6(b) is Willfully False or Fraudulently Made is an Issue of Fact for the Jury.*

Ohio Revised Code § 3923.14 provides that:

The falsity of any statement in the application for any policy of sickness and accident insurance shall not bar the right to recovery thereunder, or be used in evidence at any trial to recover upon such policy, unless it is clearly proved that such false statement is willfully false, that it was fraudulently made, that it materially affects either the acceptance of the risk or the hazard assumed by the insurer, that it induced the insurer to issue the policy, and that but for such false statement the policy would not have been issued.

The insurer has the burden of establishing all five factors of the statute by clear and convincing evidence.  *Golden Rule Ins. Co. v. Michnay*, Nos. 90–3276, 90–3291, 1991 WL

112810, at *4 (6th Cir. June 26, 1991). "[A] false answer on a signed insurance application is [not], as a matter of law, both willful and fraudulent." *B-T Dissolution, Inc. v. Provident Life & Acc. Ins. Co.*, 123 F. App'x 159, 162 (6th Cir. 2004). A false statement is willfully false or fraudulently made if the applicant knew the answer was false and there is no evidence that the insured made an honest mistake. *Golden Rule Ins. Co.*, 1991 WL 112810, at *4; *Johnson v. Connecticut Gen. Life Ins. Co.*, 324 F. App'x 459, 467 (6th Cir. 2009); *Buemi v. Mut. of Omaha Ins. Co.*, 524 N.E.2d 183, 189 (Ohio Ct. App.1987); *Redden v. Constitution Life Ins. Co.*, 173 N.E.2d 365, 365 (Ohio 1961) ("[R]ecovery is precluded by false answers knowingly given by the insured").

It is an issue of fact whether Dorsky's response to Question 6(b) was willfully false or fraudulently made. The Ohio Court of Appeals has held that whether an insured willfully and fraudulently made false statements regarding his or her "good health" in an application for an insurance policy is a question of fact for the jury. *Green v. Acacia Mut. Life Ins. Co.*, 128 N.E.2d 222, 226 (Ohio Ct. App. 1954). There is conflicting evidence about Dorsky's medical condition, including Dorsky's own admission that he placed "self-imposed" limits on performing surgeries, as well as Dorsky's concern that he would not be eligible for the Policy due to his ongoing medical issues. (Def.'s Opp. to Pl.'s Mot. Summ. J. 10). Thus, the determination of Dorsky's medical condition and how it affected his work is for the jury.

"[G]enerally, medical conditions known to an agent are imputable to the insurer, and, in the absence of fraud or collusion on the part of the insured, the insurer is estopped from relying on such conditions to void the policy." *Sept. Winds Motor Coach, Inc. v. Med. Mut. of Ohio*, No. L-03-1151, 2004 WL 628236, at *3. Additionally, when an insurance application

11

is completed by someone other than the insured, and the insured signed the application without reading it, the insured is bound by the answers.  *Green*, 128 N.E.2d at 226.  There is testimony that Dorsky "informed [Dickenson] of ongoing medical issues that he was experiencing" and in response Dickenson told Dorsky he would be "an idiot not to get [the] policy."  (Dickenson Decl. ¶9; Dorsky Dep. 238).  However, it is unclear to what extent Dickenson knew the details of Dorsky's medical condition and how it affected his work in order to accurately encourage Dorsky to purchase the Policy.  Moreover, Dickenson completed the Application for Dorsky and Dorsky testified that he did not review the Application before signing it.  Thus, it is a question of fact whether Dickenson was truly informed of Dorsky's condition and whether Dorsky's signature on the Application without reviewing the answers made the statements willfully false and fraudulently made.

There are genuine issues of material fact regarding the element of willfully false and fraudulently made.  Consequently, Summary Judgment is precluded for both parties on the Rescission claim.

### C. Summary Judgment is Denied to Berkshire Life and Dorsky on the Declaratory Judgment Claim.

There are issues of fact for the jury to decide regarding whether the Policy should be rescinded.  Therefore, the Court cannot declare and enter judgment that the Policy is null and void.  Thus, Summary Judgment is denied to both parties on the Declaratory Judgment claim.

### D.  Summary Judgment is Denied to Berkshire Life and Dorsky on the Breach of Contract Counterclaim.

In Ohio, the elements of breach of contract are: "1) the existence of a valid contract; 2)

performance by the plaintiff; 3) breach by the defendant; and 4) damage or loss to the plaintiff." *Res. Title Agency, Inc. v. Morreale Real Estate Servs.*, Inc., 314 F. Supp. 2d 763, 769 (N.D. Ohio 2004). "An insurance policy is a contract." *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1261 (Ohio 2003). Because there are issues of fact for the jury the Court cannot decide whether the Policy was properly rescinded. Thus, the Court cannot decide whether there was a breach of contract and Summary Judgment is precluded for both parties on the Breach of Contract Counterclaim.

### E. Summary Judgment in Favor of Berkshire Life is Granted on the Breach of the Covenant of Good Faith and Fair Dealing Counterclaim Because Berkshire Life Acted Within the Terms of the Policy.

Under Ohio law, "an insurer has a duty to act in good faith in the handling and payment of the claims of its insured." *Hoskins v. Aetna Life Ins. Co.*, 452 N.E.2d 1315, 1319 (Ohio 1983); *see Little v. UNUM Provident Corp.*, 196 F. Supp 2d 659, 666 (S.D. Ohio 2002). An insurer breaches this duty when its failure to perform under the contract "is not predicated upon circumstances that furnish a reasonable justification therefor." *Zoppo v. Homestead Ins. Co.*, 644 N.E.2d 397, 400 (Ohio 2012). Mere refusal to pay an insurance claim is not enough to show an insurer's bad faith. *Little*, 196 F. Supp 2d at 666. The test for a breach of the duty of good faith and fair dealing "is not whether the [insurer's] conclusion to deny benefits was correct, but whether the decision to deny benefits was arbitrary or capricious, and there existed a reasonable justification for the denial." *Thomas v. Allstate Ins. Co.*, 974 F.2d 706, 711 (6th Cir. 1992). There may be a reasonable justification for the denial when "the claim was fairly debatable and the refusal is premised on either the status of the law at the time of the denial or the facts that gave rise to the claim." *Barbour v. Household Life Ins. Co.*, No.

1:11 CV 110, 2012 WL 1109993, at *5 (N.D. Ohio Apr. 2, 2012) (quoting *Tokles & Sons, Inc. v. Midwestern Indemn. Co.*, 605 N.E.2d 936, 943 (1992)); *see also Corbo Properties, Ltd. v. Seneca Ins. Co., Inc.*, 771 F.Supp.2d 877, 880 (N.D.Ohio 2011) ("[A]n 'arbitrary and capricious' denial is not reasonably justified; but a claim that is 'fairly debatable' would be reasonably justified."). Berkshire Life acted reasonably and its denial of benefits was not arbitrary and capricious because the contract language was susceptible to two different interpretations and thus the claim was "fairly debatable." Further, the Policy includes an incontestability period in which the Policy is incontestable after it has been in force for two years. Berkshire Life denied Dorsky's claim and rescinded the Policy two days before the end of the incontestability period. Dorsky alleges that Berkshire Life breached their fiduciary duty of good faith and fair dealing by "foot dragging in the claims-handling and evaluation process." (Def's Opp. To Pl. Mot. Summ. J. 14). However, "the implied duty of good faith cannot be breached by acting as allowed by the specific terms of the contract." *Wendy's Int'l, Inc. v. Saverin*, 337 F. App'x 471, 477 (6th Cir. 2009); *Jim White Agency Co. v. Nissan Motor Corp. in U.S.A.*, 126 F.3d 832, 834 (6th Cir. 1997) (holding that a franchisor cannot "be found liable for failure to act in good faith where it has done no more than to insist on enforcing its contract rights to the detriment of its franchisee"). The incontestability period was a specific term of the Policy agreed upon by both parties. Berkshire Life investigated the claim, denied the claim and rescinded the policy within the incontestability period. Thus, Berkshire Life was acting within the specific terms of the contract and did not breach its duty of good faith. The Court grants Summary Judgment to Berkshire Life on the Breach of the Covenant of Good Faith and Fair Dealing Counterclaim.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiff and Counterclaim Defendant Berkshire Life's Motion for Summary Judgment on the Breach of the Covenant of Good Faith and Fair Dealing Counterclaim.  The Court DENIES Berkshire Life's Motion for Summary Judgment on the Rescission and Declaratory Judgment Claims, as well as the Breach of Contract Counterclaim.  The Court DENIES Defendant and Counter-Claimant Dorsky's Motion for Summary Judgment on the Rescission and Declaratory Judgment Claims, as well as Dorsky's Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing Counterclaims.

**IT IS SO ORDERED**.

                                                   s/ Christopher A. Boyko  
                                                   **CHRISTOPHER A. BOYKO**  
**DATED:  March 31, 2016**                 **UNITED STATES DISTRICT JUDGE**